Mike and Virginia Mercure [1] v. Commissioner. Mercure v. Commissioner
Docket Nos. 1477-65, 1332-66, 320-67, 321-67.
United States Tax Court
T.C. Memo 1969-206; 1969 Tax Ct. Memo LEXIS 92; 28 T.C.M. (CCH) 1092; T.C.M. (RIA) 69206; September 30, 1969. Filed *92 James C. Herndon and Jack H. Cohen, 25 E. Rebecca St., East Palestine, Ohio, for the petitioners. John P. Graham and Larry L. Nameroff, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Initially this case involved deficiencies and additions to tax, asserted by respondent, for a twenty-five year period as follows: for the taxable years 1939 through 1949, $226,879.19 deficiencies in income tax and $131,093.17 additions to tax; for the taxable years 1950 and 1951, $66,763.02 deficiencies in income tax and $42,385.88 additions to tax; for the taxable years 1952 through 1960, $283,624.89 deficiencies in income tax and $63,199.88 additions to tax; and for the taxable years 1961 through 1963, $14,837.68 deficiencies in income tax. The deficiencies for the years 1939 through 1955 were determined by the net worth method and for the years 1956 through 1963 on a specific item basis. The parties have, by agreement, disposed of all issues involving the years 1939 through 1947 and 1956 through 1963. They have also by agreement disposed of all but one issue for the years 1948 through 1955. That issue, which remains for our determination *93 herein, involves the amount of currency on hand at the beginning of the period and at the end of each of the years for the purposes of the net worth computation. The deficiencies in tax and additions to tax involved in the years 1948 through 1955 are as follows: 1093 *10 Year
Deficiency
Section 293(b)
Additions to tax
1939 Code Section294(d)(1)(A)
Section294(d)(2)
1954 CodeSection 6653(a)
1948
$72,456.77
$36,228.39
194 9
54,919.37
35,027.98
$3,295.16
1950
10,265.46
7,673.22
1951
56,497.56
28,248.78
$6,463.88
1952
80,613.58
40,306.79
1953
35,590.60
17,795.30
1954
26,973.44
2,742.35
$1,348.67
1955
20,135.43
1,006.77
Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference and found accordingly, including those relating to the years no longer in issue. Mike Mercure and Virginia Mercure are husband and wife and had their legal residences in New Waterford, Ohio, at the time of the filing of the petitions herein. They were married in 1950. Petitioner Mike Mercure (hereinafter referred to as Mercure) filed individual tax returns for the years 1939 through 1949. *94 Petitioners filed joint tax returns for the years 1950 through 1963. [2]
Mercure was born in 1909, the oldest boy in a family of twelve children. When he was 13, he quit school and took a job at a local furniture factory. When he was about 16, he began to engage in bootlegging activities. Over the ensuing four or five years, he took whatever time off from work that those activities required. Mercure sold his bootleg liquor in the small town of New Waterford, Ohio, and in nearby towns and small cities. He purchased bottled liquor in large cities in Ohio, and to a lesser extent in other states. He also bottled some liquor himself and, during one period, operated an illicit still. He sold the liquor by the case to other bootleggers and directly to consumers. He also sold to the latter by the bottle. He had several cars which he used to transport the liquor from his sources and to his customers. *95 He drove the cars himself, with the liquor in the back, usually at night. In 1932, Mercure was arrested in Carnegie, Pennsylvania, for violation of the National Prohibition Act by transporting one gallon of "moonshine whiskey," was convicted on his plea of guilty, and was fined. The business was lucrative enough so that Mercure was able to set aside and save a substantial amount of money over the years. He was paid for his whiskey in currency and he kept his savings in this form. During the first few years, he hid the currency in various stashes around his father's farm in New Waterford. During the late 1920's, he acquired a steel box with a lock and began keeping the currency in it. Until sometime in the mid-1930's, Mercure hid this box in various places on his father's farm. In about 1929 or 1930, Mercure stopped working as an employee and went into business for himself. In the early years he operated a gasoline station and an automobile junk yard. His father and one of his brothers worked at the gasoline station. Mercure opened a checking account at the New Waterford Bank and put enough cash into the account from time to time so that any payments his father and brother had to *96 make in the course of operating the gasoline station could be made by check. Otherwise he ran both businesses on a currency basis. In 1933 or 1934, Mercure obtained a license to sell 3.2 percent beer and opened a beer garden, which he also ran on a currency basis. He also sold bootleg liquor at this beer garden. In 1934, Mercure went into the trucking business, doing business as Mercure Trucking, and operating at first with about nine trucks. His main activity was hauling coal from strip mining areas. In 1935, he tried coal stripping, but found his partners uncongenial and withdrew after a few months. While Mercure initially operated Mercure Trucking primarily on a currency basis, beginning around 1937 he began to use the bank account at the New Waterford Bank (first opened for his gasoline station) for that business. When checks 1094 were drawn on this account, little attention was paid to the balance, with the result that there were very frequent overdrafts, especially in the early years. During the years 1929 through 1951, the annual amount of overdrafts varied from a low of zero or a nominal amount (in 1931, 1932, and 1950) to a high of $11,477.38 in 1941. Frequently *97 the bank would notify Mercure that his account was overdrawn and he would bring in currency to replenish it before the day was over. In 1938, Mercure's second wife started divorce proceedings against him. Her petition for divorce recited, inter alia, that he had "accumulated a large sum of money." Mercure's answer contained a general denial which applied to this allegation. During the course of the divorce proceedings, his wife obtained a temporary restraining order upon Mercure's account at the New Waterford Bank; he succeeded in having this order modified on the ground that he needed the account in order to conduct his business. A divorce was granted in 1939; no alimony was allowed. In 1935 or 1936, Mercure hired one Henrietta Burt to work for him as a bookkeeper. At her suggestion, he put the steel box in a safe which was located on the same premises as the beer garden. In about 1937, Mercure sold his beer garden and completely ceased his bootlegging activities. He moved his office and residence to a building on Route 7 near New Waterford and put the safe in the basement. In about 1939, Mercure again entered the coal stripping business, this time with one John Jones as his *98 partner. They operated under the name of M & J Coal Company. Mercure put up all the money for this business. Shortly thereafter, Mercure bought into an existing coal stripping business under the name of Burnrite Coal Company and for a time operated it in partnership with one Dominic Ross. He found Ross uncongenial, bought him out, and operated Burnrite as a proprietorship for a few months. Sometime during 1941, he put both businesses into one corporation, named Burnrite Coal Company, newly organized for the purpose. Of 50 shares of common stock issued, Mercure owned 25, Jones 22, and Henrietta Burt 3. In 1938, Mercure began to borrow money at the New Waterford Bank. At first the amounts were relatively small. By the middle of 1939, he had paid off all loans. In the spring of 1940, he began again to borrow, taking out loans every few months throughout the years of World War II. During this period, the amounts were more substantial, typically between $1,000 and $2,000, and frequently more, especially in 1944 and 1945. After the war, the pace of his borrowing slowed, but the amounts increased. He stopped borrowing in 1951 and completely paid off his debt to the bank in 1953. From the *99 spring of 1940 until 1953, he had debts outstanding at the bank almost continuously. The annual amount of new loans varied from a low of $875 in 1939 to a high of $20,550 in 1948. Mercure also borrowed $3,071.21 from the First National Bank, East Palestine, Ohio, in 1939. He repaid this loan in several installments in 1940 and, immediately upon complete repayment, took out another loan for $4,360. He repaid this loan in six substantially equal installments over the following 17 months. During early 1942, Mercure was called up several times for examination by his draft board. In June of 1942, fearful that he might be drafted without warning, he sold or caused to be sold all of the equipment of Mercure Trucking and Burnrite Coal for a substantial amount and personally received the proceeds. In due course, however, his draft board told him that he would not be drafted, and so he reinvested a substantial portion, but not all, of the proceeds of the sales in the businesses. In 1942, Mercure moved his residence and business offices to a house on Boardman Street in New Waterford. A few years later he moved to an adjacent house, where he stayed until he married petitioner Virginia Mercure *100 in 1950. He kept the safe in the basement of each house when he lived there. In 1947, Mercure constructed a new building on Route 7 and moved his offices there, but the safe stayed in his residence. During 1944, Mercure purchased at least $20,000 worth of Government bonds through the New Waterford Bank, paying in currency. Sometime in the early or middle 1940's, Mercure opened a truck dealership as a sole proprietorship, doing business as Midway Motor Sales. In 1949, the business was incorporated as Midway Motor Sales, Inc. The business operated, at least in part, on a currency basis. 1095 During the years 1948 through 1951, Burnrite Coal Company stripped coal in West Virginia for Leckie Smokeless Coal Company. Leckie Smokeless built a road part way into the stripping area and did maintenance on it. Taking advantage of this fact, Mercure and Jones caused fictitious invoices to be prepared which purported to be from Leckie Smokeless for "road repairs" and "equipment rentals." These invoices were then sent to the Burnrite Coal Company office in New Waterford, where checks to pay the invoices were prepared and mailed back to the Burnrite Coal Company office in West Virgina. *101 John Jones would then take the checks and cash them at Leckie Smokeless' offices. The checks thus cashed by Jones totalled $26,287.46 in 1948, $17,948.19 in 1949, $14,145.82 in 1950, $20,982.07 in 1951, and $501.41 in 1952. Mercure received half of this currency from Jones. Some of the currency was redeposited in a Burnrite bank account and credited to a loan payable account in favor of Jones and Mercure equally. Mercure was indicted for evasion of his income tax for 1950 and was convicted upon his plea of guilty. In April 1952, Mercure purchased a $25,000 single premium life insurance policy. He paid the $16,557 premium in currency. On February 11, 1953, a fire occurred at Mercure's offices on Route 7 which destroyed most of his records. Beginning sometime in the late 1930's, Mercure habitually carried several thousand dollars in currency on his person. One of his reasons for so doing was to be able to cash checks for his customers. During the period 1947 through 1950, Mercure cashed at the New Waterford Bank, without depositing the proceeds, checks in the total amount of approximately $147,000. The approximate amounts for each year: $43,000 in 1947, $43,000 in 1948, $34,000 *102 in 1949, and $27,000 in 1950. Mercure kept no records of his currency transactions. None of Mercure's various businesses had an account in its books and records for cash on hand or currency on hand. At the end of each year, petitioner's currency on hand was as follows: End of Year
Amount
1947
$ 70,000
1948
60,000
1949
50,000
1950
58,000
1951
48,000
1952
25,000
1953
15,000
1954
13,500
1955
10,000
Opinion Our sole task herein is to resolve a purely factual question, namely, how much, if any, of a cash hoard did Mercure have on hand on January 1, 1948 and how much of the otherwise unexplained increase in net worth is attributable to the entry of such cash into the known assets of petitioners at the end of each of the taxable years 1948 through 1955. Our determination will permit the computation of the deficiencies in income tax for those years, including additions to tax, in accordance with the agreement of the parties as to all other issues. [3]
*103 Practically all of the evidence is ancillary to the resolution of the cash hoard issue and its probative value in the last analysis turns upon our evaluation of the credibility of the testimony of the witnesses. We have made our determination on the basis of the preponderance of evidence gleaned from consideration of the record as a whole and the demeanor of the witnesses. Petitioners' position is that Mercure had a cash hoard of $250,000 on January 1, 1948, and that these funds found their way into known assets of the petitioners in the approximate amount of the otherwise unexplained increases in net worth during the taxable years 1948 through 1955. Respondent asserts that if Mercure ever had a cash hoard, it was dissipated prior to January 1, 1948 and that the annual increases in net worth during 1948 through 1955 came from unreported income. Accordingly, he concludes that petitioners are entitled to credit for cash on hand [4] of only $100 at the end of each such year. *104 We deal first with the claim of a $250,000 cash hoard on January 1, 1948. Essentially, the claim is based on the assertion that the cash on hand was accumulated from Mercure's bootlegging activities and from residual amounts derived from the 1096 sale, in the late 1930's and early 1940's, of assets of businesses in which he was interested. We are satisfied, as our findings of fact show, that Mercure was in the bootlegging business for a substantial number of years and that he accumulated some currency from that business. But retail operations in a small town such as New Waterford, Ohio, or even in several small towns and cities, could hardly have generated profits on the required scale. In this connection, we note that, aside from Mercure's own testimony, there is no evidence of the scale of his bootlegging activities. Mercure also asserted that he counted the currency in April 1948 and found just short of $250,000. The currency was in a steel box which was kept in a safe in Mercure's residence. Mercure's testimony that the steel box existed and that it was in the safe was corroborated by one Cleta Colella. But several discrepancies are apparent. In the first place, the dimensions *105 of the steel box were firmly described by Mercure as 7 inches by 10 inches by 18 inches. Yet, the space in the safe in which the steel box was located was 7 inches by 10 inches by only 16 inches. We recognize that recollection of precise measurements can easily dim with the passage of time and we are therefore not disposed to consider this discrepancy as destroying the fact that the steel box existed or was in the safe. Nevertheless, it does at least give us pause. Second, both Mercure and Cleta Colella testified that the smallest denomination of bill in the steel box was $50, with the denominations running from $50 to $1,000, and that the box was well filled. The fact is that a filled box of the size indicated would have held far more than $250,000. If the bills had consisted solely of $50 bills, the box would have held approximately $420,000. Obviously, to the extent that larger denominations were involved, the amount would be greater; if the bills were half $50's and half $100's, it would have held approximately $580,000. [5]
*106 Third, according to this testimony, Mercure accumulated the bulk of the currency between 1926 and 1937, and primarily in the earlier years. If this were the case, one would have expected that the larger portion of the hoard would have been in the form of older, larger-sized bills. [6] If, as appears likely, during the 1930's and 1940's, petitioner had brought forth a sizeable number of old bills in the small town of New Waterford, it is strange that this memorable action did not find its way into the record herein. Yet, Mercure could not remember ever changing the old bills for the new smaller-sized bills. Nor could he remember turning in gold certificates. Beyond the foregoing, there are other difficulties which stand in the way of accepting at face Mercure's uncorroborated testimony that he had $250,000 cash on hand in April 1948. First, we have serious doubts that he never knew the combination to the safe and that he only counted the cash hoard once. It seems highly unlikely that a person in Mercure's *107 position, and with the characteristics which Mercure exhibited on the witness stand, would have left himself completely at the mercy of others with respect to such sizeable amounts of money without at least an occasional check on how they were executing their trust, no matter how close his relationship to them. Second, we find it difficult to understand why, if such a sizeable cash hoard really existed, Mercure would not have made this known at an early stage of the investigation of his tax returns. Yet, his statements to the revenue agent indicated at one time only about $30,000 in cash and at another time only what he had "in his pocket. [7] Third, Mercure's 1097 credibility was substantially impaired by his disclaimer of any knowledge of the "road repair" receipts which he and Jones obtained through the manipulation of transactions between Burnrite Coal Company and Leckie Smokeless Coal Company. Such disclaimer is hard to believe in light of the evidence presented. Finally, we note that Mercure's penchant for engaging in illegal activities, i.e., bootlegging, and his conviction of income tax evasion have a bearing on the credibility to be accorded his testimony. *108 It does not follow, however, that difficulties with accepting Mercure's testimony at face require the conclusion that respondent was correct in determining that he had only $100 in cash at the end of each year. In this connection, it is not without significance that Mercure was engaged in several businesses, each with substantial gross receipts. None of the books and records contained any indication of cash on hand, although it seems highly improbable that the businesses could have operated on a no-cash-on-hand basis; indeed, the testimony indicates the opposite with respect to several of the businesses. There was also corroborative testimony that Mercure cashed checks as a courtesy for customers from time to time and that he usually carried several thousand dollars on his person. In addition, respondent's own investigation showed that Mercure cashed approximately $147,000 worth of checks at the New Waterford Bank without depositing the proceeds during the years 1947 through 1950. Nor are we convinced that any cash hoard, which Mercure may have accumulated, was entirely used up prior to January 1, 1948. Moreover, there is evidence that, on at least two occasions, Mercure made acquisitions *109 against payment of substantial amounts of currency - purchases of $20,000 of Government bonds in 1944 and a single premium life insurance policy in 1952 for $16,557. A further indication of the existence of a cash hoard was contained in the testimony of Charles Koch, an officer of the New Waterford Bank, who testified that on several occasions Mercure currency was brought in to be changed and made the unsolicited statement that "one of the things that sticks in my mind would be that quite often that [sic] was brought into the bank, had a musty smell to it, like it had been stored some place that was maybe damp or perhaps over a long period of time." Similarly, the statements of the New Waterford Bank for Mike Mercure's checking account during the period October 1, 1948 to January 30, 1956 show several large deposits in round amounts which tend to support the claim that the accumulated cash on hand was deposited in the bank during the posit-1948 years. Finally, in at least one instance, namely, the taxable year 1939, there was an excess of known expenditures over known receipts, and respondent did not hesitate to reflect this excess in cash on hand. This determination and the determination *110 of $600 in 1938 were the only two exceptions to the $100 limit. Two lines of evidence, according to respondent, tend to show that Mercure had very little cash, at least in the late 1930's and early 1940's. The first is the fact that petitioner chronically overdrew his checking account during that period. But overdrafts are not necessarily inconsistent with the existence of a cash hoard, particularly since the bank apparently did not penalize Mercure for this practice. On the contrary, the fact that the overdrafts were promptly made good tends to support the existence of such a hoard. Respondent also argues that Mercure's practice of borrowing money, sometimes in rather small amounts, shows that he did not have cash at the time. But businessmen often borrow money when they do not need to in an absolute sense, and we therefore do not regard Mercure's borrowings as necessarily showing that there was no cash hoard. In short, we are satisfied that neither petitioners' nor respondent's contention as to the amount of Mercure's cash hoard on January 1, 1948 should be accepted. We have done the best we could with the record as a whole and, based upon the preponderance of the evidence, *111 have found, as our findings of fact show, that the proper amount is $70,000. We must now determine how that cash hoard was expended. Our findings of fact reflect our conclusions in this regard based upon a consideration of the record as a whole. Among other things, we have deemed it appropriate to take into account the necessary adjustment to net worth because 1098 of the $7,862.91 excess of known adjusted gross income for 1950 over the amount of adjusted gross income shown in respondent's net worth computation. [8] The situation for that year is the reverse of that found by respondent for 1939 (where known expenditures exceeded known income) and considered by respondent as coming from cash on hand. The excess in 1950 should be reflected in petitioners' net worth and, since their expenditures for that year have been stipulated by the parties, we think the most plausible explanation for this excess is an increase in cash on hand. We have also made an adjustment to reflect the currency expenditure of approximately $16,000 for life insurance in 1952 and we think it is not inappropriate to reflect this expenditure in a decrease in cash on hand for that year. Finally, we have taken *112 into account the fact that the unexplained increases in net worth in 1954 and 1955, as computed by respondent, were quite small, both in absolute terms and in relation to such increases in earlier years - approximately $2,500 in 1954 and $7,000 in 1955. A substantial part of these increases has been explained through stipulated sources of additional income. Under all the circumstances herein, we have concluded that substantially all of the remaining unexplained increases for those two years should be attributed to the use (i.e., the decrease) of cash on hand. Petitioners' version of the cash hoard and its expenditure would be more persuasive if it were not for the fact that the record herein clearly indicates a possible source of unreported income during the years before us - namely, the "road repair" receipts. While these receipts themselves appear to account for only a fraction of the unexplained increases in net worth (the record indicates a *113 known amount of about $40,000), their existence shows that Mercure's various business enterprises, rather than a cash hoard, could have accounted for the balance of such increases. [9] Such a possibility, at the very least, is an element to be weighed in determining how far to accord credibility to the cash hoard theory advanced by petitioners, as is the pattern of concealment and evasion of tax exhibited in the handing of "road repair" receipts by Mercure and Jones. In reaching our conclusions herein, we have given careful consideration to the "Computation of Combined Currency on Hand" which was prepared by petitioners' accountant and *114 upon which petitioners rely heavily to support their version of the cash hoard and its use. The accountant started with an assumed value for currency on hand as of April 1, 1948 of $250,000. He then added to that figure all known receipts of currency during the balance of 1948. From this total, he subtracted all known disbursements of currency during the balance of 1948. The disbursements exceeded the receipts of currency; obviously, therefore, there was a source of currency not accounted for by the known receipts. The accountant assumed that this source was the currency hoard. He therefore decreased the currency hoard by a sum sufficient, when added to known receipts, to match disbursements. In this manner, he arrived at a figure for the currency hoard as of December 31, 1948. By repeating this process, he worked his way forward from year to year up until December 31, 1955. By a reversal of this process, he obtained a figure for January 1, 1948. The fact that the computation is symmetrical and gives the appearance of consistency does not require its acceptance as determinative evidence as to the initial amount of the cash hoard or of its use. Compare concurring opinion of Raum, *115 J., in , subscribed to by a majority of this Court. The computation merely shows that there was some source of currency amounting to approximately $230,000. The accountant chose to characterize this unknown source "decreases in a hoard of currency"; but, so far as the computation itself is concerned, it could equally well have been called "receipts of unreported taxable income in the form of currency." The accountant assumed that petitioner obtained the currency by putting his hand into his safe; but the currency might just as well have been put into his hand by 1099 someone else for services rendered or goods delivered. Compare (C.A. 6, 1955), reversing on other grounds a Memorandum Opinion of this Court. This is particularly so where another source of unreported income is revealed - in this case, the "road repair" receipts. Decisions will be entered under Rule 50. Footnotes
1. The following cases are consolidated herewith: Mike Mercure and Virginia Mercure, Docket No. 1332-66; Mike Mercure, Docket No. 320-67, and Mike Mercure and Virginia Mercure, Docket No. 321-67.↩
2. Petitioner Virginia Mercure is consequently involved herein only with respect to these years and is a party herein solely because of her joint tax liability with her husband. Subsequent references to petitioners shall be deemed to include Virginia Mercure only where the context so requires.↩
3. There may be some discrepancies between the calculations of the parties relating to other matters, but these appear capable of resolution in connection with the entry of decision under Rule 50.↩
4. In respondent's net worth computations, "checks on hand" is carried as a separate asset. The parties have understandably ignored coin on hand - de minimis non curat lex. For the purposes of this opinion, the phrase "cash on hand" or "currency" will mean currency and coin on hand.↩
5. Our calculation is based upon Mercure's testimony, that the bills were in $10,000 packets and were stacked in two rows of packets, one on top of the other, facing the 10inch x 7inch end of the box and running its full length, with the space between the sides of the double rows and the side of the box filled with packets standing on end and also facing the 10inch x 7inch end. It is also based on the premise that the bills were new bills (see footnote 6, infra). Petitioners made no claim to the contrary and, indeed, Mercure's testimony indicates that the currency in the box on January 1, 1948 was obtained in post-1932 exchanges of bills of smaller denominations into $50's and $100's. We have also assumed that the box was only 14 inches long, which is the minimum length indicated by the testimony and allows for the thickness of the box. We also note that two rows of packets one on top of the other would only occupy 5 inches of the 7-inch dimension, with the result that our calculation assumes that the box was not completely filled. A $10,000 packet of circulated $50 bills, i.e., used bills as distinguished from freshly engraved bills, is 31/32 inches thick, and a $10,000 packet of $100 bills is 18/32 inches thick.↩
6. The old bills were discontinued and the new bills first issued on July 10, 1929. Treasury Department Circular No. 415 (June 3, 1929). The old bills, however, were not recalled.↩
7. hoard as a bootlegger and that he stopped bootlegging in 1937.↩
8. Respondent's net worth computation showed an adjusted gross income of $91,528.30, although stipulated amounts of specific items of income plus $7,072.91 of "road receipts" produce an individual adjusted gross income of $99,391.21.↩
9. The parties have stipulated many other items of unreported income and erroneous deductions. We have refrained from drawing any unfavorable inferences from such stipulations, partly because we recognize that they may be compromises accepted by petitioners in return for concessions by the respondent in unrelated areas. In addition, the record does not flesh out these stipulations with the kind of factual detail necessary for us to determine with any degree of certainty the actual existence of still further possible sources of unreported income.↩